1  E. JOSEPH CONNAUGHTON (SBN 166765)
   JEFFREY P. AMES (SBN 234871)
2  DANIELLE M. BLACKHALL (SBN 251555)
3  **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
   101 W. Broadway, Ninth Floor
4  San Diego, California 92101-8285
   Telephone: 619-237-5200
5  Facsimile: 619-615-0700
   Email: jconnaughton@paulplevin.com
6
7  KEVIN M. FLOWERS, PH.D. (admitted *pro hac vice*)
   MARK H. IZRAELEWICZ (admitted *pro hac vice*)
8  JOHN R. LABBE (admitted *pro hac vice*)
   CULLEN N. PENDLETON, PH.D. (admitted *pro hac vice*)
9  AMANDA K. ANTONS, PH.D. (admitted *pro hac vice*)
10 **MARSHALL, GERSTEIN & BORUN** LLP
   233 South Wacker Drive
11 6300 Willis Tower
   Chicago, Illinois 60606-6357
12 Telephone: 312-474-6300
   Email: kflowers@marshallip.com
13
14 Attorneys for Plaintiffs
   ILLUMINA, INC. and ILLUMINA CAMBRIDGE LTD.
15
16            UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF CALIFORNIA
17

| | |
|---|---|
| 18 | Case No. 3:12-cv-01465-BEN-BGS |
| 19 ILLUMINA, INC. and ILLUMINA | **ILLUMINA'S OPENING CLAIM** |
| 20 CAMBRIDGE LTD., | **CONSTRUCTION BRIEF** |
| 21 Plaintiffs, | Hon. Roger T. Benitez |
| 22 | Date:     July 11, 2013 |
| 23 v. | Time:    9:00 A.M. |
| 24 | Room:    4B |
| 25 COMPLETE GENOMICS, INC., | |
| 26 Defendant. | |
| 27 | |
| 28 | |

# TABLE OF CONTENTS

I.    Introduction ........................................................................... 1

II.   Factual background ............................................................... 2

   A.   Structure and function of DNA ..................................... 2

   B.   DNA sequencing ............................................................ 4

   C.   The inventions described and claimed in the '930 patent ......... 4

   D.   Methods of "reading" sequence information ............................. 6

III.  Legal standards for claim construction ............................................ 8

IV.   Argument ......................................................................... 9

   A.   "first and second regions" ........................................... 10

      1.   Illumina's construction is based on the plain language
           of the claim and specification ............................................... 10

      2.   CGI's construction is unjustifiably complex ...................... 11

   B.   "in the same target double stranded polynucleotide" ............... 12

      1.   Illumina's construction is based on the plain language
           of the claim and specification ............................................... 13

      2.   CGI attempts to improperly narrow the claim with
           additional limitations .......................................................... 14

         a.   CGI's construction improperly limits the claim to
              preferred embodiments in the specification ............... 15

         b.   The specification expressly contemplates
              alternatives to CGI's proposed construction ............... 16

         c.   CGI's proposed construction violates the rule of
              claim differentiation ....................................................... 17

         d.   The prosecution history supports Illumina's
              construction ...................................................................... 18

C.  "reading from a [first/second] primer"......................................... 19

    1.  Illumina's construction is based on the plain language of the claim and specification................................................. 20

    2.  CGI's construction improperly excludes alternative methods of "reading" recited in the specification............... 20

D.  "removing the first primer".......................................................... 22

    1.  The Court need not construe "removing the first primer"............................................................................... 22

    2.  CGI's construction is ambiguous and unjustifiably narrows a simple term ........................................................ 22

E.  "different location".................................................................... 24

    1.  Illumina's construction makes clear what occurs at a "different location"............................................................. 24

V.  Conclusion ........................................................................... 25

1

# TABLE OF AUTHORITIES

2

CASES

3

4

*Enzo Biochem, Inc. v. Applera Corp.*,
    599 F.3d 1325 (Fed. Cir. 2010) ........................................... 15, 16, 21

5

6

*Gen-Probe Inc. v. Becton Dickinson & Co.*,
    2011 WL 7167137 (S.D. Cal. Nov. 22, 2011) .................................. 22

7

8

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009) ...................................................... 15

9

10

*Morvil Technology, LLC v. Medtronic Ablation Frontiers, LLC*,
    2012 WL 3277272 (S.D. Cal. Aug. 10, 2012) ................................. 19

11

12

*Netflix, Inc. v. Blockbuster, Inc.*,
    477 F. Supp. 2d 1063 (N.D. Cal. 2007) .......................................... 22

13

14

*Northrop Grumman Corp. v. Intel Corp.*,
    325 F.3d 1346 (Fed. Cir. 2003) ...................................................... 16

15

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ....................................... 8, 9, 14, 18

16

17

*Saunders Group, Inc. v. Comfortrac, Inc.*,
    492 F.3d 1326 (Fed. Cir. 2007) ................................................ 15, 17

18

19

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ...................................................... 15

20

21

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ...................................................... 22

22

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ...................................................... 8, 9

23

24

25

26

27

28

## I.   Introduction

The patent-in-suit, U.S. Patent No. 8,192,930 ("the '930 patent"), describes and claims specific methods for obtaining sequence information from nucleic acids such as DNA. These "paired-end" sequencing methods enable one to successfully "read" sequence information sequentially from two distinct, separate regions on a single piece of DNA.

Plaintiff Illumina, Inc. (and its subsidiary, Illumina Cambridge Ltd.) (collectively, "Illumina") is one of the leading companies in genetic analysis. The '930 patent resulted from Illumina's pioneering work in next-generation DNA sequencing technologies. Illumina employs its patented paired-end reading method in its highly successful commercial sequencing instruments, which enable scientists to sequence an entire human genome in just over a day.

Defendant Complete Genomics, Inc. ("CGI"), a wholly-owned subsidiary of BGI-Shenzhen, is a recent entrant to the field of genetic analysis. Illumina asserts that CGI infringes claim 1 of the '930 patent by using what CGI calls its Combinatorial Probe Anchor-Ligation ("cPAL") technology.

The parties disagree about the construction of five terms in claim 1. Illumina's proposed constructions are drawn from the language used in claim 1 and the specification of the '930 patent, and will aid the jury in understanding the meaning of the claim. In contrast, in an effort to create non-infringement defenses, CGI proposes constructions that violate fundamental rules of claim construction, are inconsistent with the intrinsic record, and obscure the meaning of the claim.

CGI ignores the plain language of claim 1, instead proposing that limitations from the specification be imported into the claim. For

example, CGI proposes that the Court construe "in the same target double stranded polynucleotide" to require that the two strands of the polynucleotide be "linked to the solid support at or near their 5' ends." But claim 1 does not include a "solid support," nor does it require linking the strands "at or near their 5' ends." CGI also asks the Court to construe "reading from a [first/second] primer" to be limited to a particular method of "reading" sequence information. But claim 1 includes no such limitation and the specification discloses alternative methods for "reading" sequence information.

In both cases, CGI violates the rule against limiting claims to preferred embodiments described in the specification. Even where the specification discloses only a single embodiment, features of that embodiment may not be read into the claims unless the specification makes a clear disclaimer of claim scope. Here, the specification contains no such disclaimer, and expressly says the claimed pairwise method is *not* limited to a particular method for reading DNA sequence information, as CGI contends. CGI's constructions also violate the rule of claim differentiation by importing limitations from dependent claims into claim 1.

Moreover, CGI's proposed constructions will not aid the jury in deciding this case because they are needlessly complex and ambiguous, and will therefore confuse the meaning of the claim.

## II.  Factual background

### A.  Structure and function of DNA

All living things contain DNA, in the form of very long strands made up of its four building blocks, called "nucleotides." The four nucleotides are referred to as A, C, G, and T. An organism's DNA sequence—that is,

1  the order of its A's, C's, G's, and T's—determines what proteins are made

2  in its cells and tissues. In this way, an organism's DNA sequence

3  determines its identity.

4      Each nucleotide in a strand of DNA is composed of a base, a sugar,

5  and a phosphate group. Under the right conditions, the phosphate group

6  of one nucleotide can covalently bond with the sugar of another

7  nucleotide, creating a "polynucleotide" chain. The four bases of DNA

8  (adenine (A), cytosine (C), guanine (G), and thymine (T)) are attached to

9  the sugar-phosphate backbone of a polynucleotide chain. The bases in one

10  strand of DNA can hydrogen-bond (or "hybridize") with the bases in

11  another strand of DNA to form a double-stranded polynucleotide (the

12  famous "double helix"). Such

13  binding is "complementary": A's

14  in one strand will only

15  hybridize with T's in the other

16  strand, and C's will only

17  hybridize with G's, as

18  illustrated at right.



19      A polynucleotide chain is

20  said to be "directional" because

21  the two ends of the chain are

22  chemically different. One end

23  is called the 5' (pronounced

24  "five prime") end and the other

25  end is called the 3' end. The



26  phosphate group (P) is at the 5' end of the nucleotide, and it can form a

27  covalent bond with a "hydroxyl" (OH) group at the 3' position of the sugar

28  of another nucleotide.

### B.  DNA sequencing

This case involves DNA sequencing. DNA sequencing is the process of determining information about the sequence of nucleotides in a sample of DNA. Illumina manufactures, sells, and uses DNA-sequencing technologies that enable scientists to sequence DNA samples at high speeds and low costs. Using an Illumina instrument, a scientist can, for example, sequence an individual's complete DNA (a "genome")—which contains about 3 billion nucleotide pairs—in just over a day for less than $10,000. To put that in perspective, the Human Genome Project, which started in the 1990s using previous-generation technology, took thirteen years and cost almost $3 billion to sequence a single human genome. Illumina's DNA sequencing advances are revolutionizing research and paving the way for personalized medicine, in which physicians select medicines or tailor treatments specifically for each patient based on his or her DNA sequences.

### C.  The inventions described and claimed in the '930 patent

The inventions described and claimed in the '930 patent are methods of "pairwise" or "paired-end" sequencing. To prepare genomic DNA to be sequenced, one must first cut lengthy DNA strands into many smaller fragments. The sequence information obtained from each of these smaller fragments is then assembled by computer to create the entire genome sequence. The "pairwise" or "paired-end" methods described in the '930 patent increase the sequence information obtained from each fragment, which simplifies assembling the entire genome sequence. As the '930 patent explains:

> Paired-end sequencing allows the determination of two "reads" of sequence from two places on a single polynucleotide duplex. The advantage of the paired-end approach is that there is significantly

more information to be gained from sequencing two stretches each of "n" bases from a single template than from sequencing "n" bases from each of two independent templates in a random fashion. With the use of appropriate software tools for the assembly of sequence information . . . it is possible to make use of the knowledge that the "paired-end" sequences are not completely random, but are known to occur on a single duplex, and are therefore linked or paired in the genome.

(Exh. A at 2:5–18.)

Claim 1 of the '930 patent states:

A method for pairwise sequencing of first and second regions of a double stranded polynucleotide wherein said first and second regions are in the same target double stranded polynucleotide,

the method comprising

hybridising and reading from a first primer,

removing the first primer

followed by hybridising and reading from a second primer at a different location in the same target double stranded polynucleotide.

(Exh. A at 37:37–43.)

Importantly, although claim 1 is limited to these steps ((i) "hybridizing and reading from a first primer," (ii) "removing the first primer," (iii) "followed by hybridizing and reading from a second primer . . ."), it is **not** limited to a particular method of "reading" sequence information from a polynucleotide. Instead, the specification expressly states that the claimed methods "can be used in conjunction with **essentially any** sequencing methodology which relies on successive incorporation of nucleotides into a polynucleotide chain." (Exh. A at 22:9–13 (emphasis added).) The specification describes "sequencing-by-

synthesis" and "sequencing by ligation-based methods" as two of the sequencing methodologies that are compatible with the claimed methods. (Exh. A at 21:32–33 and 22:16.)

### D. Methods of "reading" sequence information

Although claim 1 of the '930 patent is not limited to any particular method of reading sequence information, some background on "sequencing-by-synthesis" and "sequencing-by-ligation" methods will help place the parties' competing claim-construction arguments in context. (Exh. C at 527–530 (comparing methods of sequencing).)

Using either "sequencing-by-synthesis" or "sequencing-by-ligation," a scientist can read sequence information from a single-stranded polynucleotide. Both methods include first hybridizing a short single-stranded piece of DNA (called a "primer") to a region of the polynucleotide near where sequencing information is desired.

After hybridizing a primer, sequencing-by-synthesis and sequencing-by-ligation employ different techniques for "reading" bases near the primer. Sequencing-by-synthesis employs the enzyme "DNA polymerase" to add a single, labeled nucleotide to the end of the primer. This enzyme catalyzes covalent bonding between the 5' end of the labeled nucleotide and the 3' end of the primer (*i.e.*, adding a nucleotide in the 5' to 3' direction). This creates an extended double-stranded "duplex" comprising the primer and one labeled nucleotide both hybridized to the polynucleotide. The label on the nucleotide identifies which nucleotide (A, C, G, or T) has been incorporated. For example, the incorporated nucleotide may have a fluorescent label attached so that if it is an "A," it will glow red when scanned with a laser, or green if it is a "C," and so on. The identity of the incorporated nucleotide can later be used to determine

1  the identity of the complementary nucleotide in the polynucleotide at the

2  corresponding position (for example, if the incorporated nucleotide is an

3  "A," the nucleotide at the corresponding position in the polynucleotide

4  must be a "T"). This process may be repeated to obtain further sequence

5  information near the primer.



14  Sequencing-by-ligation employs a different enzyme, DNA ligase, to

15  add labeled oligonucleotide probes (short single-stranded DNA chains) to

16  the end of a primer. DNA ligase catalyzes covalent bonding of a probe to

17  either the 3' or 5' end of the primer (unlike in sequencing-by-synthesis,

18  where DNA polymerase can only join a labeled nucleotide to the 3' end of

19  the primer). This creates an extended double-stranded "duplex"

20  comprising the linked primer and probe both hybridized to the

21  polynucleotide. Similar to sequencing-by-synthesis, the probes used in

22  sequencing-by-ligation can be labeled and "read" to identify one or more

23  nucleotides within the probe. The identity of a nucleotide in the probe can

24  later be used to determine the identity of the complementary nucleotide

25  in the polynucleotide at the corresponding position. This process may also

26  be repeated to obtain further sequence information near the primer.

27

28

| Sequencing-by-synthesis | Sequencing-by-ligation |
|---|---|
| Uses the enzyme DNA polymerase | Uses the enzyme DNA ligase |
| Relies on incorporation of a single nucleotide to read sequence information | Relies on incorporation of an oligonucleotide probe to read sequence information |
| Nucleotides must be incorporated in the 5' to 3' direction | Probes can be incorporated in either the 5' to 3' direction or 3' to 5' direction |

### III. Legal standards for claim construction

The words in a patent claim "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. To determine the ordinary and customary meaning of the terms, the Court "should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic

1  evidence is the most significant source of the legally operative meaning of
2  disputed claim language." *Vitronics*, 90 F.3d at 1582.

3      "[T]he claims themselves provide substantial guidance as to the
4  meaning of particular claim terms," and "[o]ther claims of the patent in
5  question, both asserted and unasserted, can also be valuable sources of
6  enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at
7  1314. "[T]he specification is always highly relevant to the claim
8  construction analysis. Usually, it is dispositive; it is the single best guide
9  to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. However,
10  even "if a patent describes only a single embodiment," the Court should
11  not import limitations from the preferred embodiment in the specification
12  if those limitations are not in the claim. *Phillips*, 415 F.3d at 1323.
13  Finally, "[l]ike the specification, the prosecution history provides
14  evidence of how the PTO and the inventor understood the patent." *Id*.
15  at 1317.

16      "In most situations, an analysis of the intrinsic evidence alone will
17  resolve any ambiguity in a disputed claim term. In such circumstances, it
18  is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1582.

19  **IV. Argument**

20      Illumina and CGI disagree on the construction of five terms in claim
21  1. For each term, Illumina proposes a construction that comports with
22  the plain language of the claim and the specification (or contends no
23  construction is necessary), while CGI attempts to create non-
24  infringement arguments by reading unwarranted limitations into the
25  claim terms. Most notably, although claim 1 is not limited to a particular
26  method of reading sequence information, CGI attempts to limit the claim
27  to sequencing-by-synthesis methods because CGI uses sequencing-by-
28  ligation.

For convenience, here again is Claim 1, with the disputed terms in boldface:

> A method for pairwise sequencing of **first and second regions** of a double stranded polynucleotide
>
> wherein said first and second regions are **in the same target double stranded polynucleotide**,
>
> the method comprising
>
> hybridising and **reading from a first primer**,
>
> **removing the first primer**
>
> followed by hybridising and reading from a second primer **at a different location** in the same target double stranded polynucleotide.

(Exh. A at 37:37–43.)

We will address the parties' competing proposed constructions for these terms in the order they appear in Claim 1.

### A.   "first and second regions"

| Claim Term | Illumina's Construction | CGI's Construction |
|---|---|---|
| "first and second regions" | "two distinct and separate single-stranded portions" | "two distinct portions of the target double-stranded polynucleotide for sequence determination. The first and second regions for sequence determination are either on the same strand, or on complementary strands, of the double-stranded polynucleotide template." |

### 1.   Illumina's construction is based on the plain language of the claim and specification

Consistent with the teaching of the specification, Illumina proposes that the Court construe "first and second regions" to mean, simply, "two

1  distinct and separate single-stranded portions." The specification refers

2  to the two regions to be sequenced as "distinct and separate" regions of

3  the polynucleotide. (Exh. A at Abstract, 1:22.) Other parts of the

4  specification refer to "two distinct regions." (*Id.* at 3:25, 4:22.) Thus, the

5  language "distinct and separate" expressly appears in the specification

6  and makes clear to the jury that the two regions do not overlap.

7        As the specification explains, the two regions to be sequenced must

8  be single-stranded.: "To enable two separate sequencing reactions it is in

9  turn necessary to sequentially hybridise to two different *single-stranded*

10 regions to serve as templates for sequencing." (Exh. A at 8:51–54; *see also*

11 *id.* at 4:21–24; 13:31–33 (again referring to the "two distinct regions" to

12 be sequenced as "single stranded").)

13       Figure 1 of the '930 patent illustrates that the first and second

14 regions to be sequenced are separate and distinct. (*Id.* Fig. 1.) As

15 illustrated in Figure 1 and explained in the specification, a first primer is

16 hybridized to a first single-stranded region before a second primer is

17 hybridized to a second, separate and distinct single-stranded region. (*Id.*

18 Fig. 1 & 4:28–37.)

19              2.    **CGI's construction is unjustifiably complex**

20       CGI agrees with Illumina that the first and second regions must be

21 distinct and single-stranded. Specifically, CGI's construction

22 acknowledges that the two regions are "two distinct portions of the target

23 double-stranded polynucleotide for sequence determination." And CGI

24 agrees that the two regions must be single-stranded because according to

25 CGI, the two regions "are either on the same strand, or on

26 complementary strands" of the template. But CGI's proposed

27 construction requires additional limitations that are not in the claim

28

1   language. These additional limitations are not justifiable and obscure the

2   meaning of the term.

3       First, by arguing that the two regions must be "on the same strand,

4   or on complementary strands," CGI acknowledges that the two regions

5   are single-stranded. But this additional limitation should not be part of

6   the construction of *this* term, because the *next* term in the claim, "in the

7   same target double stranded polynucleotide," already specifies the

8   location of the two regions. The parties separately propose different

9   constructions for that term.

10      Second, CGI asks this Court to construe "first and second regions" to

11  include additional limitations beyond the plain meaning of the phrase.

12  CGI's proposed construction uses the term "double-stranded

13  polynucleotide *template*," which does not appear anywhere in the claim.

14  Adding this limitation without any antecedent basis does nothing to

15  clarify the meaning of the claim and would likely confuse the jury. Rather

16  than introduce additional limitations not found in the claim, the Court

17  should adopt Illumina's straightforward construction of "first and second

18  regions" to mean "two distinct and separate single-stranded portions."

19  **B.   "in the same target double stranded polynucleotide"**

| Claim Term | Illumina's Construction | CGI's Construction |
|---|---|---|
| "in the same target double stranded polynucleotide" | "in the same strand or complementary strands derived from the original polynucleotide duplex from which sequencing information is desired" | "in the template polynucleotide duplex formed from complementary first and second template strands which are linked to the solid support at or near their 5' ends" |

### 1.   Illumina's construction is based on the plain language of the claim and specification

Illumina defines "in the same target double stranded polynucleotide" to mean that the two regions to be sequenced are in the same strand or complementary strands derived from the original polynucleotide duplex from which sequencing information is desired. Without this clarification, the jury might incorrectly assume that the two regions to be sequenced are themselves double-stranded. According to the '930 specification, "two different *single-stranded regions* . . . serve as templates for sequencing." (Exh. A at 8:53–54 (emphasis added).) The specification further explains that "[f]ormation of suitable *single-stranded regions* for sequencing can be achieved by any of the ways described herein." (*Id.* at 8:54–56 (emphasis added).) Thus, one of ordinary skill would understand that the two regions of the double-stranded polynucleotide from which sequence information is obtained are single-stranded.

Accordingly, "in the same target double stranded polynucleotide" does not mean the two regions themselves are double-stranded, but rather that they are single-stranded regions *derived from* the same double-stranded polynucleotide. Given that the two regions must themselves be single-stranded, if they were not *derived from* the *same* double-stranded polynucleotide, the claim term "in the *same* target double stranded polynucleotide" would be meaningless.

Numerous examples in the '930 specification support Illumina's construction. Figure 1, for instance, illustrates that the two regions to be sequenced are single-stranded. (Exh. A Fig. 1.) The specification explains that the "target double stranded polynucleotide" is denatured before sequencing to provide "single-stranded polynucleotides" to be sequenced. (*Id.* at 4:3–6, 9–14, 15–18, 21–24.) Figure 8 illustrates a double-stranded

polynucleotide that can be cut in two with a restriction enzyme, allowing one to take "two reads derived from the original polynucleotide duplex." (*Id.* Fig. 8 & 9:26–50.) Moreover, numerous examples in the '930 specification describe amplification (making many copies) of the original template polynucleotide for sequencing, meaning that the actual molecules that are sequenced are derived from an original polynucleotide rather than just the original polynucleotide itself. (*Id.* Figs. 4–7, 6:66–7:2.)

The specification explains (and CGI agrees) that the two "regions" to be sequenced are in the same strand, or in complementary strands, of the polynucleotide. (Exh. A at 5:54–57.) And the specification further describes the "target double-stranded polynucleotide" as "any polynucleotide that it is desired to sequence." (Exh. A at 22:18–20.) The Court should therefore construe the term to mean "in the same strand or complementary strands derived from the original polynucleotide duplex from which sequencing information is desired."

## 2.   CGI attempts to improperly narrow the claim with additional limitations

CGI's proposed construction adds additional limitations not found in claim 1. CGI acknowledges that the double-stranded polynucleotide is a duplex with complementary first and second strands. But CGI proposes a construction that requires those strands to be "linked to the solid support at or near their 5' ends." This limitation does not appear in the claim.

Claim 1 itself shows that CGI's construction is incorrect: claim 1 says nothing about the polynucleotide strands being attached to a solid support, much less at their 5' ends. These words appear nowhere in the claim. "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. The Court

1  should not read limitations into the claim that do not appear in the

2  claim. *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347 (Fed. Cir.

3  2009) ("Here, when the inventor wanted to restrict the claims to require

4  the use of a key, he did so explicitly. None of the claims at issue on appeal

5  recite the term "key.").

### a.   CGI's construction improperly limits the claim to preferred embodiments in the specification

6

7

8  The Court may not limit claims to a preferred embodiment in the

9  specification if the claims are broader than the embodiment. *Teleflex, Inc.*

10  *v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002)

11  ("[L]imitations from the specification are not to be read into the claims.").

12  "The claims, not specification embodiments, define the scope of patent

13  protection." *Kara Tech.*, 582 F.3d at 1348. Indeed, even if the

14  specification describes only a single embodiment, the claims should not

15  be limited to that embodiment "unless the patentee . . . characterize[d]

16  the invention in the intrinsic record using words or expressions of

17  manifest exclusion or restriction, representing a clear disavowal of claim

18  scope." *Teleflex*, 299 F.3d at 1327; *see also Saunders Group, Inc. v.*

19  *Comfortrac, Inc.*, 492 F.3d 1326, 1332 (Fed. Cir. 2007) ("Even where a

20  patent describes only a single embodiment, claims will not be read

21  restrictively unless the patentee has demonstrated a clear intention to

22  limit claim scope.").

23  Here, CGI asks this Court find that claim 1 requires attaching the

24  polynucleotide to a solid support, and that it must be attached at its 5'

25  end. Neither limitation appears in the claim. CGI's improper construction

26  is like that in *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1333

27  (Fed. Cir. 2010), where the Federal Circuit reversed a district court's

28  claim construction that "read a 'hybridization' requirement into the

1   claims." The Federal Circuit found that "[n]othing in the claims refers to

2   hybridization, and neither the specification nor the prosecution history

3   contains a clear disclaimer or a contrary definition." *Id.*; *see also*

4   *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1355 (Fed. Cir.

5   2003). ("Absent a clear disclaimer of particular subject matter, the fact

6   that the inventor may have anticipated that the invention would be used

7   in a particular way does not mean that the scope of the patent is limited

8   to that context.")

9       Here, the specification of the '930 patent (i) explains that the

10   "starting point for the method of the invention is the provision of a

11   plurality of template polynucleotide duplexes immobilized on a solid

12   support" and (ii) describes the duplexes as "formed from complementary

13   first and second template strands which are linked to the solid support at

14   or near to their 5' ends." (Exh. A at 5:59–6:2.) But the concept of

15   immobilization does not appear in claim 1. The fact that the '930 patent

16   inventors anticipated that their invention could be used with immobilized

17   polynucleotides attached at their 5' ends does not limit the scope of claim

18   1 to that embodiment absent a "clear disclaimer." *Northrop Grumman*,

19   325 F.3d at 1355.

20           b.   **The specification expressly contemplates alternatives to
21                CGI's proposed construction**

22       There is no "clear disclaimer" in the '930 patent. The specification

23   explains that no particular method of immobilization (*e.g.*, covalent or

24   non-covalent, at the 5' end or elsewhere, etc.) is required to perform the

25   method of the invention: "In certain embodiments of the invention

26   covalent attachment may be preferred, but generally all that is required

27   is that the molecules (e.g. nucleic acids) remain immobilized or attached

28   to the support under the conditions in which it is intended to use the

1   support, for example in applications requiring nucleic acid amplification

2   and/or sequencing." (Exh. A at 6:19–25.)

3        According to the specification, the terms "immobilized" and

4   "attached" are "intended to encompass direct or indirect, covalent or non-

5   covalent attachment." (Exh. A at 6:16–18.) The specification does not

6   assert that attaching the polynucleotide at its 5' end is the only way to

7   practice the invention, so the claim is not so limited. *Saunders Group*,

8   492 F.3d at 1332 ("While an assertion by the patentee that using

9   pressure activated seals is the only way to maintain the needed traction

10  force would evidence an intention to narrow the scope of the independent

11  claims, the patent contains no such assertion.").

12       Moreover, according to the specification, "[t]he methods of the

13  invention are not limited to use of the sequencing method outlined [in the

14  preferred embodiment]." The specification expressly states that the

15  methods can be used with other techniques, including, for example,

16  "sequencing by ligation-based methods" such as the method described in

17  U.S. Patent No. 6,306,597 ("the '597 patent"). (Exh. A at 22:9–17.) The

18  claims of the '597 patent do not require the polynucleotide to be attached

19  to any solid support. (Exh. B at 21:26–34.) To the extent the written

20  description of the '597 patent suggests the polynucleotide be attached to a

21  solid support, it does not require any particular method of attachment.

22  The '597 patent expressly discloses attaching the polynucleotide at either

23  its 3' or 5' end. (Exh. B at 9:12–13, 10:35–36.)

24           c.   **CGI's proposed construction violates the rule of claim**
25                **differentiation**

26       The rule of claim differentiation weighs against reading

27  immobilization or attachment to a solid support into claim 1. Claim 1 is

28  the only independent claim in the '930 patent. All of the remaining

claims ultimately depend from claim 1, and all of the dependent claims include immobilization of the polynucleotide or attachment to a solid support as an additional claim limitation. (Exh. A at 37:36–40:32.) "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. Thus, claim 1 should not be construed to include a limitation to immobilization or attachment.

> **d.   The prosecution history supports Illumina's construction**

The prosecution history of the '930 patent also weighs against CGI's proposed construction. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. During prosecution, the patent examiner interpreted claim 1 to ***not*** require immobilization or attachment, while the examiner interpreted the remaining claims to require attachment to a surface. The examiner initially rejected claim 1 (then-application claim 27) as anticipated by (*i.e.*, all the elements of claim 1 were disclosed in) the "Weimann" reference, which she said "does not teach attachment to a clustered array" or immobilization of the polynucleotide on a solid support. (Exh. D, March 4, 2011 Office Action at 9.) But the examiner only found the remaining claims obvious based on the combination of Weimann *and* the "O'Meara" reference, which added the disclosure of "providing a solid support" with immobilized templates. (*Id.* at 5–7.) If the examiner thought claim 1 was limited to immobilization or attachment to a surface, she could not have found the claim anticipated by Weimann because she acknowledged that the <u>attachment</u> element was missing in Weimann. Instead, she would have also cited O'Meara as part of her rejection of claim 1.

Most notably, Illumina never disputed that claim 1 (application

claim 27) does not require immobilization or attachment, but rather amended the claim to recite "followed by" to overcome the anticipation rejection. (Exh. E, Dec. 7, 2011 Amendment & Response at 6–7; Exh. F, Apr. 2, 2012 Notice of Allowance at 2–3.) Accordingly, the prosecution history also establishes that the inventors understood claim 1 not to require immobilization or attachment.

For exactly this reason, this Court has previously refused to read an additional limitation into a claim. *Morvil Technology, LLC v. Medtronic Ablation Frontiers, LLC*, 2012 WL 3277272, at *5 (S.D. Cal. Aug. 10, 2012) (Benitez, J.). In *Morvil*, this Court rejected the defendants' proposal to incorporate a limitation into the claim where, during patent prosecution, (i) the examiner had initially found the claim anticipated by a prior art reference that lacked the same limitation the defendants sought to read into the claim and (ii) the inventors never disputed the anticipation rejection based on the missing limitation in the prior art. *Id.*

The Court should reject CGI's proposed construction because it requires that the polynucleotide be attached to a solid support, a limitation not found in the claim, let alone attachment at the 5' end.

### C.   "reading from a [first/second] primer"

| Claim Term | Illumina's Construction | CGI's Construction |
|---|---|---|
| "reading from a first primer"<br><br>"reading from a second primer" | "obtaining sequence information near where the [first/second] primer has hybridized" | "the successive incorporation of nucleotides into a polynucleotide chain synthesized in the 5' to 3' direction from the [first/second] primer and the determination of the nature of the nucleotide after each incorporation" |

1  2    **1.   Illumina's construction is based on the plain language of the claim and specification**

3   Illumina proposes that "reading from a primer" be construed to mean
4   "obtaining sequence information near where the primer has hybridized."
5   Illumina's construction defines "reading" to mean obtaining sequence
6   information, and that "from a primer" means near the primer. This
7   construction is consistent with the plain meaning of the term when read
8   in light of the specification. First, the specification explains that "[u]sing
9   the method of the invention it is possible to obtain two linked or paired
10  *reads of sequence information*" from the polynucleotide template. (Exh. A
11  at 3:27–31 (emphasis added).) The "reads of sequence information" are
12  the result of the "reading" step in claim 1. The term "reading" in claim 1
13  therefore means obtaining sequence information. But, contrary to CGI's
14  argument, obtaining sequence information, or "reading," does not require
15  "determination of the nature of the nucleotide after each incorporation," a
16  step which the specification refers to as a "particular embodiment."
17  (Exh. A at 21:36–38.)

18   According to the '930 patent, the bases to be read "do not, however,
19  need to be contiguous, nor does every base on the entire fragment have to
20  be sequenced." (Exh. A at 6:46–48.) Thus, "reading from a primer" means
21  sequence information must be obtained near the primer. It does not
22  require determining the identity of the base immediately contiguous to
23  the primer, or every base adjacent to the primer.

24  25    **2.   CGI's construction improperly excludes alternative methods of "reading" recited in the specification**

26   CGI's claim construction is simply another attempt to limit the claim
27  to a specific method of sequencing: sequencing-by-synthesis in the 5' to 3'
28  direction. Although the '930 specification says that "[s]equencing can be

carried out using any suitable 'sequencing-by-synthesis' technique . . . resulting in synthesis of a polynucleotide chain in the 5' to 3' direction," (Exh. A at 21:32–36), the specification says the "methods of the invention *are not limited to* use of the sequencing method outlined above" (*id.* at 22:9–10 (emphasis added)). Instead, the methods of the invention "can be used with essentially any sequencing methodology which relies on successive incorporation of nucleotides into a polynucleotide chain." (*Id.* at 22:10–13.) "Suitable techniques include, for example, Pyrosequencing™, FISSEQ . . ., MPSS . . . and *sequencing by ligation*-based methods, for example as described in U.S. Pat. No. 6,306,597." (*Id.* at 22:13–17 (emphasis added).)

The "sequencing-by-ligation-based method" described in the '597 patent is a "method of identifying nucleotides in a template by stepwise extension of one or more primers by successive ligations of oligonucleotide blocks." (Exh. B at 1:12–14.) According to the '597 patent, the extension of primers by ligation may occur in the 5' to 3' direction or the 3' to 5' direction. (Exh. B at 6:13–15, figs. 2 & 3A.) CGI's construction of "reading" to limit it to sequencing-by-synthesis in the 5' to 3' direction would exclude this method. Thus, it cannot be correct because the '930 patent recites multiples examples of how the claimed method can be used, and expressly states it is not limited to sequencing-by-synthesis.

Accordingly, CGI's proposed construction of "reading" also violates the rule against limiting claims to a preferred embodiment. Again, where the claim does not contain a particular limitation, and the specification does not contain a "clear disclaimer," the Court should not read limitations from the preferred embodiment into the claim. *Enzo Biochem*, 599 F.3d at 1333. Here, the specification lacks a "clear disclaimer" and

1   expressly recites alternative methods of reading that CGI's proposed

2   construction would exclude.

3       **D.**    **"removing the first primer"**

| Claim Term | Illumina's Construction | CGI's Construction |
|---|---|---|
| "removing the first primer" | This term need not be construed, or if construed, the Court should construe this term as having its plain and ordinary meaning. | "heating or chemically denaturing from the surface the first sequencing primer when the first sequencing reaction is complete." |

9       **1.**    **The Court need not construe "removing the first primer"**

10   "Removing the first primer" does not need construction because

11   "removing" is a commonly-understood word with no special meaning in

12   the patent or the field of sequencing. The Court need not construe claim

13   terms that do not require clarification. "The *Markman* decisions do not

14   hold that the trial judge must repeat or restate every claim term in order

15   to comply with the ruling that claim construction is for the court." *U.S.*

16   *Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

17   Instead, claim construction serves "to clarify and when necessary to

18   explain what the patentee covered by the claims." *Id.* For example,

19   "commonly-understood English words" do not need clarification. *Netflix,*

20   *Inc. v. Blockbuster, Inc.*, 477 F. Supp. 2d 1063, 1068 (N.D. Cal. 2007); *see*

21   *also Gen-Probe Inc. v. Becton Dickinson & Co.*, 2011 WL 7167137, at *17

22   (S.D. Cal. Nov. 22, 2011) (Benitez, J.) ("[T]erms 'penetrated by,'

23   'penetrated,' and 'penetrating' are common terms that need no

24   clarification.").

25       **2.**    **CGI's construction is ambiguous and unjustifiably narrows a**
                **simple term**

27   CGI's proposed construction adds limitations, such as "heating or

28   chemically denaturing," that do not appear in the claim. Although

Illumina agrees that "removing" can include "heating or chemically denaturing," CGI's construction adds ambiguity and unjustifiably attempts to narrow the scope of the claim. CGI replaces a word the jury will understand—"removing"—and replaces it with a word likely unfamiliar to the jury—"denaturing." Further, the phrases "from the surface" and "first sequencing reaction" lack any basis in the claim and merely add ambiguity to an otherwise unambiguous term.

CGI also attempts to add a temporal limitation to the claim. Illumina agrees that in the context of the entire claim, the step of "removing the first primer" follows the step of "hybridizing and reading from a first primer." But the term "removing the first primer" by itself does not incorporate that requirement. CGI attempts to read the concept of a "first sequencing reaction" into the claim and require that the "first sequencing reaction" "be complete" before the first primer is removed. This is unwarranted. Although claim 2 refers to a "first sequencing reaction," (Exh. A at 37:57), that limitation does not appear in claim 1. Therefore, adding the requirement that the "first sequencing reaction be complete" before removing the first primer violates the rule of claim differentiation and would only add confusion, not clarity to the claim.

Finally, CGI once again attempts to incorporate a "surface" limitation into claim 1, although that limitation does not appear in the claim. (*Supra* section IV.B.2.)

The Court should not construe "removing the first primer" because the term does not require clarification and CGI's proposed construction is ambiguous and unduly narrow.

1

**E.   "different location"**

2

| Claim Term | Illumina's Construction | CGI's Construction |
|---|---|---|
| "different location" | "a location distinct and separate from the location of hybridizing and reading from the first primer" | "location of the second region that is distinct from the first region" |

3

4

5

6

7

**1.   Illumina's construction makes clear what occurs at a "different location"**

8

Claim 1 requires "hybridizing and reading from a first primer . . .

9

followed by hybridizing and reading from a second primer at a different

10

location." Illumina offers a construction of "different location" to make

11

clear that "different location" modifies "hybridizing and reading from a

12

second primer." This is to say that the "different location" is distinct and

13

separate from the hybridizing *and* reading from the first primer.

14

Illumina's construction is dictated by the plain language of claim 1.

15

The term "at a different location" immediately follows and modifies the

16

phrase "hybridizing and reading from a second primer." And the term

17

distinguishes the location of the "hybridizing and reading from the

18

second primer" from the previously-recited "hybridising and reading from

19

the first primer." Thus, a contextual reading of claim 1 supports

20

Illumina's proposed construction.

21

In contrast, CGI replaces the actual claim language with the phrases

22

"second region" and "first region." CGI defines "different location" to

23

mean that the *second* region is different from the *first* region, which

24

provides no clarification: the jury must study the claim to decide what

25

qualifies as the "first region" and what qualifies as the "second region."

26

Illumina's construction is better because it explicitly tells the jury that

27

*both* hybridizing *and* reading must occur at distinct and separate

28

locations. Illumina's construction makes clear *what* must occur at a "different location," and properly defines the term "different location" in the context of what the claim actually says.

Illumina's construction is also consistent with the specification. The specification explains that both hybridizing and reading occur at different locations. Regarding hybridizing, the '930 specification explains that "it is in turn necessary to sequentially hybridize to two *different single-stranded regions* to serve as templates for sequencing." (Exh. A at 8:52–54 (emphasis added).) And with respect to reading, the specification explains that "pairwise sequencing refers to *a pair of reads* obtained by sequencing *two distinct regions*." (Exh. A at 3:23–25 (emphasis added).)

Finally, the '930 specification states the two different regions are "distinct and separate." (Exh. A at Abstract, 1:19–23.) The term "different location" therefore requires distinct and separate locations for both hybridizing and reading.

## V.   Conclusion

For all of the foregoing reasons, the Court should adopt Illumina's proposed claim constructions and reject CGI's proposed constructions.


Dated: May 29, 2013              Respectfully submitted,
                                 MARSHALL, GERSTEIN & BORUN LLP

                              By:  /s/ John R. Labbé
                                 John R. Labbé (admitted *pro hac vice*)
                                 Attorneys for Plaintiffs